1  Robert C. Moest (Bar No. 62166)
   LAW OFFICES OF ROBERT C. MOEST
2  2530 Wilshire Blvd. 2nd Floor
   Santa Monica, CA 90403
3  Tel:  (310) 915-6628
   (310) 915-9897 (fax)
4  rmoest@aol.com

5  David M. Liberman (Bar No. 108469)
   9709 Venice Blvd. No. 4
6  Los Angeles, CA 90034
   Tel: (424) 298-8648
7  (310) 837-1056 (fax)
   mightyarm@msn.com

8
   Attorneys for Plaintiffs
9  Krishna Lunch of
   Southern California, Inc., et al.

10

11            UNITED STATES DISTRICT COURT

12            CENTRAL DISTRICT CALIFORNIA

13               WESTERN DIVISION

14  KRISHNA LUNCH OF SOUTHERN        )   Case No.  16-cv-8422-DSF-
    CALIFORNIA, INC., a California nonprofit )        PLA
15  religious corporation; RAJU MANTHENA, )
    an Individual; SRINIVAS PRASAD, an )
16  Individual; NIKITA KATHURIA, an    )
    Individual; RAKSHA DUTT, an Individual; )   MEMORANDUM OF LAW
17  VIDORI VAIDE, an Individual; and  BRUCE )   IN SUPPORT OF
    ELLINGSON, an Individual,          )   PLAINTIFFS' MOTION
18                                     )   FOR PRELIMINARY
              Plaintiffs,             )   INJUNCTION
19                                     )
                                       )
20       vs.                           )
                                       )   Date : Dec. 13, 2021
21  MONROE GORDON JR., Interim Vice    )   Time: 1:30 p.m.
    Chancellor of Student Affairs, in his official )   CR    : Hon. Dale S. Fischer
22  capacity,                          )         Courtroom 7D
                                       )
23            Defendant.              )
                                       )
24  _____   )

25

26

27

28

---

**1**

**MEMO OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**page**

TABLE OF AUTHORITIES............................................... iii

INTRODUCTION...................................................... 1

BACKGROUND....................................................... 2

    A. Krishna Lunch................................................ 2

    B. The Designate Area........................................... 2

    C. Relevant COVID-19 Guidelines................................. 3

    D. Procedural Background........................................ 4

PRELIMINARY INJUNCTION STANDARD............................ 5

ARGUMENT......................................................... 6

    I.     INTRODUCTION. ....................................... 6

    II.    THE DESIGNATED AREA IS A PUBLIC FORUM
           UNDER FEDERAL AND CALIFORNIA LAW................. 6

          A. First Amendment.......................................... 7

          B. California Constitution..................................... 9

    III.   PLAINTIFFS WILL LIKELY SUCCEED ON
           THE MERITS............................................ 11

          A. Krishna Lunch Is Singled Out For Disfavored
            Treatment. ............................................ 11

          B. The Ban Is Also Subject To Strict Scrutiny Because
            It Proscribes An Entire Category Of Expression............. 12

          C. The Ban Is Not The Least Restrictive Means Of
            Achieving A Compelling State Interest.................... 13

          D. The Restriction Fails The *O'Brien/*Time,
            Place And Manner Test.................................. 14

            1. Content-based. .................................... 14

            2. The restriction is not narrowly tailored................. 17

    IV.   IRREPARABLE HARM. ................................. 19

**TABLE OF CONTENTS (cont.)**

<u>**Page**</u>

V.      AN INJUNCTION SERVES THE PUBLIC INTEREST. . . . . . . . . 20

VI.     RECENT SUPREME COURT DECISIONS WARRANT
        THE REINSTATEMENT OF PLAINTIFFS'
        FREE EXERCISE CLAIM.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

1

# TABLE OF AUTHORITIES

2

**Page**

3

## FEDERAL CASES

4 *Arcara v. Cloud Books, Inc.*,
        478 U.S. 697 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
5
*All. for the Wild Rockies v. Cottrell*,
6        632 F.3d 1127 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

7 *Am.-Arab Anti-Discrimination Comm. v. Reno*,
        70 F.3d 1045 (9th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
8
*Ass'n of Community Orgs. for Reform Now v. St. Louis County*,
9        930 F.2d 591 (8th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

10 *Bay Area Peace Navy v. United States*,
        914 F.2d 1224 (9th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
11
*Bd. of Trustees of Univ. of N.Y. v. Fox*,
12        492 U.S. 469 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

13 *Berger v. City of Seattle*,
        569 F.3d 1029 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 17, 19
14
*Burbridge v. Sampson*,
15        74 F. Supp. 2d 940 (C.D. Cal. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . 7

16 *Calvary Chapel Dayton Valley v. Sisolak*,
        982 F.3d 1228 (9th Cir. 2020). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
17
*Carreras  v. City of Anaheim*,
18        768 F.2d 1039 (9th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

19 *Children of the Rosary v. City of Phoenix Eyeglasses*,
        154 U.S. 972 (9th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
20
*City of Cincinnati v. Discovery Network*,
21        507 U.S. 410 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17,18

22 *City of Ladue v. Gilleo*,
        512 U.S. 43 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
23
*Clark v. Community for Creative Non-Violence*,
24        468 U.S. 288 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14,17

25 *Colacurcio v. City of Kent*,
        163 F.3d 545 (9th Cir.1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
26
*Cornelius v. NAACP Legal Def. & Educ. Fund*,
27        473 U.S. 788 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

28

1

## TABLE OF AUTHORITIES (cont.)

2
<span style="float:right">**Page**</span>

3
*Disney Enters., Inc. v. VidAngel, Inc.*,
       869 F.3d 848 (9th Cir. 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
4

*Edwards v. City of Coeur D'Alene*,
5
       262 F.3d 856 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

6
*Elrod v. Burns*,
       427 U.S. 347 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20,23
7

*Frisby v. Schultz*,
8
       487 U.S. 474 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6,12

9
*Gannett Co., Inc. v. DePasquale*,
       443 U.S. 368 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
10

*Grossman v. City of Portland*,
11
       33 F.3d 1200 (9th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

12
*Gutierrez v. Municipal Court*,
       838 F.2d 1031 (9th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
13

*Hague v. CIO*,
14
       307 U.S. 496 (1939). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

15
*Hays County Guardian v. Supple*,
       969 F.2d 111 (5th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
16

*Higher Taste v. City of Tacoma*
17
       755 F. Supp.2d 1130 (W.D. Wash. 2010).. . . . . . . . . . . . . . . . . . . . . . . . 5,6

18
*Jacobs v. Clark County Sch. Dist.*,
       526 F.3d 419 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14,15
19

*Jacobsen v. United States Postal Serv.*,
20
       812 F.2d 1151 (9th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

21
*Krishna Lunch of S. Cal.. Inc. v. Gordon*,
       797 Fed.Appx. 311 (9th Cir. 2020). . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*
22

*Kuba v. 1-A Agricultural Ass'n*,
23
       387 F.3d 850 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9,16

24
*Members of City Council v. Taxpayers for Vincent*.
       466 U. S. 789 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
25

*Minneapolis Star and Tribune Co. v. Minnesota Comm'r of Rev.*,
26
       460 U.S. 575 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

27
*Mitchell v. Cuomo*,
       748 F.2d 804 (2d Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
28

# TABLE OF AUTHORITIES (cont.)

**Page**

*Mitchell v. Newsom,*
509 F. Supp. 3d 1195 (C.D. Cal. 2020). . . . . . . . . . . . . . . . . . . . . . . . . 10,11

*Multimedia Publ'g Co. v. Greenville-Spartanburg Airport Dist.,*
991 F.2d 154 (4th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

NAACP v. City of Richmond,
743 F.2d 1346 (9th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Pacific Gas & Elec. v. P.U.C. of California,*
475 U.S. 1 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Perry Education Assn. v. Perry Local Educators' Assn.,*
460 U.S. 37 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Project 80's, Inc. v. City of Pocatello,*
942 F.2d 635 (9th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
141 S. Ct. 63 (2020). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,21-23

*Springfield v. San Diego Unified Port Dist.,*
95 F. Supp. 1482 (S.D. Cal. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Santa Monica Food Not Bombs,*
450 F.3d 1022 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Students Against Apartheid Coalition v. O'Neil,*
660 F. Supp. 333 (W.D. Va. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Turner Broad. Sys., Inc. v. Fed. Commc'n Comm'n,*
512 U.S. 622 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Grace,*
461 U.S. 171 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Eichman,*
496 U.S. 310 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. O'Brien,*
391 U.S. 367 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Vegan Outreach, Inc. v. Riverside Cnty. College Dist.,*
No. cv 09-4625, 2009 WL 10700113  (C.D. Cal. 2009).. . . . . . . . . . *passim*

1

**TABLE OF AUTHORITIES (cont.)**

2                                                                            <u>Page</u>

3  *Women Strike for Peace v. Hickel,*
          420 F.2d 597 (D.C. Cir. 1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
4
   *Winter v. Nat. Res. Def. Council, Inc.*,
5          555 U.S. 7 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

6

7  **STATE CASES**

8  *Gonzales v. Superior Court of State of Cal. for County of Ventura,*
          180 Cal.App.3d 1116 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,9
9
   *In re Hoffman*,
10         67 Cal. 2d 845 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

11 *Prigmore v. City of Redding,*
          211 Cal. App. 4th 1322 (2012).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
12
   *Robins v. Pruneyard Shopping Center,*
13         23 Cal.3d 899 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

14 *U.C. Nuclear Weapons Labs Conversion Project v.*
          *Lawrence Livermore Lab.,*
15         154 Cal. App.3d 1157 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,10

16 **CONSIT. PROVISIONS**

17         Cal. Const. Art. I, §2 (a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
18

19 **RULES AND REGULATIONS**

20 *Policies Applying to Campus Activities,*
          *Organizations and Students.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,8
21
   *UCLA return to campus, Visiting Campus*,
22         https://covid-19.ucla.edu/ ucla-return-to-campus/

23         *Campus stores.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

24         *COVID requirements Vaccination policy.* . . . . . . . . . . . . . . . . . . . . . . . . 4

25         *General visitors.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,11,15

26         *Guidance for campus events.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

27         *Facemasks – Outdoors.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

28

**TABLE OF AUTHORITIES (cont.)**

<u>Page</u>

*Invited guests and third-party contractors*. . . . . . . . . . . . . . . . . . . . . . 4,11,19

*Large outdoor events*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Meetings and conferences*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*UCLA recreation facilities*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Restaurants and dining facilities*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*UCLA Regulations on Activities, Registered Campus Organizations
and Use of Properties* § II (7/20/10). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

<u>**OTHER AUTHORITIES**</u>

A.C. Bhaktivedanta Swami,
  *Bhagvad-gita As It Is*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

A.C. Bhaktivedanta Swami,
  *Srimad Bhavatam*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Centers for Disease Control and Prevention,
  *COVID-19: How to Protect Yourself and
  Others* (Updated Aug. 13, 2021) https://www.cdc.
  gov/coronavirus/2019-ncov/prevent-getting-sick/
  prevention.html.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Daily Bruin Staff, *This is my UCLA: Bruinwalk*,
  Daily Bruin (June 6, 2010),
  found at https://dailybruin.com/2010/ 06/06/gradbruinwalk2.. . . . . . . . 8,11

Derek P. *Langhauser, Drawing The Line Between Free And
  Regulated Speech On Public College Campuses:
  Key Steps And The Forum Analysis*,
  181 W.E.L.R. 339 (Dec. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Harvard  Health Pbl'g,
  *Preventing the spread of the corona virus*, (Oct. 13,  2021)
  https://www.health.harvard.edu/diseases-and-conditions/
  preventing-the-spread-of-the-coronavirus. . . . . . . . . . . . . . . . . . . . . . . 13, 16

Jano le Roux,
  *"Meat is now classified as the same level of cancer-causing
  products as tobacco,"* the WHO says, (June 15, 2021),
  https://original.newsbreak.com/@jano-le-roux-561725/
  2281886417094-meat-is-now-classified-as-the-same-level-of-
  cancer-causing-products-as-tobacco-the-who-says?s=i3. . . . . . . . . . . . . . 15

**TABLE OF AUTHORITIES (cont.)**

<u>**Page**</u>

Thomas J. Davis, *Assessing Constitutional Challenges*
    *to University Free Speech Zones Under Public Forum Doctrine*,
    79 Ind. L. J. 267 (2004).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

UCLA Happenings Events Calendar,
    https://happenings.ucla.edu.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

World Health Organization,
    *Coronavirus disease (COVID-19):*
    *Small public gatherings* (Aug. 6, 2020) https://www.who.int/
    emergencies/diseases/novel-coronavirus-2019/question-
    and-answers-hub/ q-a-detail/coronavirus-disease-covid-
    19-small-public-gatherings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**INTRODUCTION**

Plaintiffs challenge the abridgement of their rights under the Free Speech, Assembly and Association, and Free Exercise Clauses of the United States and California Constitutions. Plaintiffs seek to conduct a vegan/vegetarian lunch program on the UCLA campus, to convey their pro-animal/anti-meat message. The Defendant has banned "Krishna Lunch" from the entire campus even though UCLA is now generally open to students and members of the public.

The distribution of sanctified vegan and vegetarian food is part of the speech and associational rights protected by the First Amendment, *Krishna Lunch of S. Cal. Inc. v. Gordon*, 797 Fed.Appx. 311, 313-14 (9th Cir. 2020). Plaintiffs seek to serve their blessed food in a small alcove adjacent to Bruin Walk East.

Under rules suspended during the Covid-19 pandemic and not yet reinstated, plaintiffs would have been permitted to engage in their activity in that location [designated area], but would have been permitted to do so only four times per year. That Draconian restriction was challenged in this suit when it was filed.

Now, however, UCLA has imposed a total ban on Krishna Lunch in a public forum. Following a COVID-19 shut down of over a year, UCLA on September 23, 2021 resumed pre-pandemic levels of operations, but now bans Krishna Lunch entirely. The justification for this ban is purportedly related to "Covid and safety issues."[1]

"But even in a pandemic, the Constitution cannot be put away and forgotten." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020) (per curiam). UCLA's ban is subject to the highest level of scrutiny, and contravenes, *inter alia*, recent Supreme Court directives on reasonable measures that can be implemented to address COVID-19 concerns short of a complete ban

---

[1] Email from Robert Cordozo, UCLA Counsel, to Krishna Lunch Counsel, Robert Moest and David Liberman, Sept. 2, 2021 (on file with Plaintiffs' counsel).

**MEM. OF LAW IN SUPP. OF MOT. FOR PREL. INJ.**

on First Amendment rights. *See, e.g., id.* (Gorsuch, J., concurring at 69) and (Kavanaugh, J., concurring at 72).

It also fails intermediate scrutiny under *United States v. O'Brien*, 391 U.S. 367 (1968). UCLA cannot explain why Krishna Lunch has been singled out for especially harsh treatment that is not applied to other food service operations. Plaintiffs' agreement to wear masks, get vaccinated, physically distance, and wash frequently, is a viable, efficacious, and far less restrictive alternative to a complete ban.

## BACKGROUND

A. <u>Krishna Lunch</u>. Krishna consciousness was founded in 1965 by His Divine Grace A.C. Bhaktivedanta Swami Prabhupada ("Srila Prabhupada"), the eleventh guru in a succession of teachers extending back to the Fifteenth Century. (Brown Decl. ¶ 4). Srila Prabhupada instructed his followers to spread the religion by (1) chanting in public places; (2) distributing religious literature; and (3) distributing sanctified vegan and vegetarian food to as many people as possible. (*Id.*). Eating of meat, fish, or eggs is strictly prohibited. (*Id.* ¶ 5).

Consuming prasada and sharing it with others is the "cornerstone of the religion." (*Id.* ¶ 6). "The . . . world is full of contaminations, and one who is immunized by accepting prasada of the Lord (food offered to Vishnu) is saved from the attack." A.C. Bhaktivedanta Swami, *Bhagvad-gita As It Is* 178. "The Krishna consciousness movement is based on this principle: chant the Hare Krishna mantra at every moment . . . and distribute prasâda . . . . Simply by liberal distribution of prasâda and sankîrtana, the whole world can become peaceful and prosperous." A.C. Bhaktivedanta Swami, *Srimad Bhavatam,* 4.12.10 (purport).

In addition to the distribution of prasada, the Krishna Lunch program will display signs and banners, distribute religious literature, and speak with interested persons about the purpose and meaning of Krishna Lunch.  (*Id*. ¶ 7).

B. <u>The Designated Area</u>.  The area at issue is a small, concrete alcove

---

**MEM. OF LAW IN SUPP. OF MOT. FOR PREL. INJ.**

located in the middle of campus at the southeast corner of the Student Activities Center. It is immediately adjacent to Bruin Walk East, the main Free Speech area on campus. The area is approximately 3,240 square feet. Krishna Lunch will occupy about 100 square feet. (Brown Decl. ¶ 10; *see* Fourth Amend. Compl., Ex. A).[2]  The area also has a concrete patio and tables where people can relax, read, converse, and eat lunch. An expansive lawn area extends north and east from the designated area to the Powell Library, and is available for eating, reading, and conversing.

C.  Relevant COVID-19 Guidelines:

•  Open Campus: UCLA is open to the general public, including the Luskin Conference Center, the medical center, museums, botanical gardens, restaurants and campus grounds. *See UCLA return to campus, Visiting Campus*, *General visitors*, https://covid-19.ucla.edu/ucla-return-to-campus/.

•  Food services:  "Restaurants and dining halls on campus can now operate indoors *and outdoors with no limits on seating capacity or physical distancing requirements*." *Id.* at *Restaurants and dining facilities*. (emphasis added).[3]

•  Events and Gatherings. "Organized events" including celebrations, dances, lectures, forums, performances, rallies, social gatherings, concerts, speaker presentations, and conferences do not have capacity limits or physical distancing restrictions. *Id.* at *Guidance for campus events*.

•  Meetings. Meetings are permitted. *Id.* at *Meetings and conferences*.

•  Outdoor Events.  L.A. County "recommends, but does not require" outdoor events with crowds of more than 10,000 to verify vaccinations or negative

---

[2]  Hereinafter "FAC."

[3]  Plateia at the Luskin Conference Center, for example, "is currently offering indoor *and outdoor dining*, as well as takeout meals." *Id.* (emphasis added).

**MEM. OF LAW IN SUPP. OF MOT. FOR PREL. INJ.**

1   test results of attendees. Masks are recommended. *Id.* at *Large outdoor events.*

2   ● <u>Bookstores</u>:  The Ackerman Union bookstore and other stores are open to

3   the public without physical distancing or capacity limits.  *Id*. at *Campus stores.*

4   ● <u>Gyms</u>: Gyms and recreation facilities, including hot tubs and saunas, can

5   operate at full capacity.  *Id*. at *UCLA recreation facilities*.

6   ● <u>Vaccinations</u>.  Everyone connected to UCLA must be vaccinated.  *See*

7   *UCLA Return to campus, All Bruins*: *COVID requirements Vaccination policy*,

8   https://covid -19. ucla.edu/ucla-return-to-campus/.

9   ● <u>Masks</u>: Outdoor facemasks not required. *Id*. at *Facemasks – Outdoors*.

10   ● <u>Visitors</u>.  Persons visiting or conducting business on campus  must wear

11   masks while indoors and must complete "UCLA's Symptom Monitoring Survey."

12   *Id*. at *Invited guests and third-party contractors.*

13   D.  <u>Procedural Background</u>.  On February 9, 2018, this Court dismissed

14   Plaintiffs' Third Amended Complaint, with prejudice. (Dkt. No. 62). Plaintiffs

15   appealed (Dkt. No. 64) and on January 13, 2020, the Ninth Circuit reversed the

16   dismissal of Plaintiffs' Free Speech and Association claims but upheld the Court's

17   ruling on the Free Exercise claim. *Krishna Lunch,* 797 Fed.Appx. at 313-14. The

18   Court also remanded to determine whether the restriction is valid under *U. S. v.*

19   *O'Brien*, 391 U.S. 367 (1968).

20   Because of the COVID-19 pandemic, the action on remand was stayed

21   several times, as UCLA (and all other public and private universities and colleges

22   in California) were completely shut down during the pandemic. (Dkt. Nos. 69, 77,

23   79, 81. 83).  The campus re-opened at pre-pandemic levels on September 23, 2021.

24   UCLA informed Plaintiffs on September 2, 2021, that under UCLA's post-

25   pandemic policy, Krishna Lunch was *completely banned* from campus.  (Email

26   from Robert Cordozo, UCLA Counsel, to Krishna Lunch Counsel, Robert Moest

27

28

---

**4**

**MEM. OF LAW IN SUPP. OF MOT. FOR PREL. INJ.**

1  and David Liberman, Sept. 2, 2021).[4]

2                    **PRELIMINARY INJUNCTION STANDARD**

3         Plaintiffs should be granted a temporary restraining order and preliminary

4  injunction. For relief pendents lite, the moving party must show: (1) a likelihood

5  of success on the merits; (2) that the moving party will suffer irreparable harm in

6  the absence of preliminary relief; (3) that the balance of equities favors the moving

7  party; and (4) the injunction is in the public interest. *Winter v. Natural Res. Def.*

8  *Council, Inc.,* 555 U.S. 7, 21 (2008).

9         *I. Likelihood of Success.* The validity of the UCLA ban is a question

10  of law that will be resolved in plaintiffs' favor. Moreover, no sufficient

11  justification exists for the ban on expressive food distribution.

12         *ii. Irreparable Injury.* A special rule applies to the assessment of

13  injury in cases involving First Amendment rights:

14              Where a party establishes the likelihood of success on
               the merits, irreparable harm will also be found in
15             injunction actions involving First Amendment
               challenges. *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct.
16             2673, 49 L. Ed.2d 547 (1976).  Because [plaintiff] has
               established a likelihood of success on the merits,
17             irreparable harm is also established for purposes of the
               preliminary injunction stage of this matter.
18
19  *Higher Taste v. City of Tacoma*, 755 F. Supp.2d 1130, 1137-38 (W.D. Wash.

    2010).
20
21         *iii. Balance of Equities.* Because the UCLA ban fails First

22  Amendment scrutiny, defendant cannot claim an equitable interest in seeing the

    invalid laws enforced.
23
24         *iv. Public Interest.*  "Where a party establishes the likelihood of

25  ───────────────────────

26    [4]  Defendant previously warned the Plaintiffs that they would be prosecuted
    under Cal. Educ. Code § 92440.5 and Cal. Code Regs. §§ 100004 and 1000012, as
27  well as other applicable codes and ordinances, should they attempt to conduct the
    Krishna Lunch program without approval. (FAC ¶ 35).
28

success on the merits, the public interest will also be implicated in injunction actions involving First Amendment challenges. *Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 383, 99 S. Ct. 2898, 61 L. Ed.2d 608 (1979) (it is always in the public interest to prevent one from violating another's constitutional rights)." *Higher Taste*, 755 F. Supp.2d at 1139.

## ARGUMENT

I.   INTRODUCTION.

The UCLA ban draws an impermissible distinction between Krishna Lunch and similar activities conducted by UCLA and others. Consequently, UCLA must prove that its ban is the least restrictive means of achieving a compelling state interest. Strict scrutiny applies because the restriction is not merely a time, place and manner regulation of speech, but a complete ban.  It is the antithesis of narrow tailoring.

The ban also fails intermediate scrutiny.  First, it is content-based because it draws an impermissible distinction between Plaintiffs' expressive activities and comparable UCLA and commercial activities. Second, it burdens substantially more speech than is required, and ignores numerous, obvious, and readily available less burdensome alternatives to a ban, such as plaintiffs' agreement to wear facial masks, be fully vaccinated, physically distance, wash frequently, and clean and sanitize the entire Krishna Lunch area at regular intervals.

II.   THE DESIGNATED AREA IS A "PUBLIC FORUM" UNDER BOTH FEDERAL AND CALIFORNIA LAW.

Public forum analysis is framed by "the access sought by the speaker. When speakers seek general access to public property, the forum encompasses that property  . . .  In cases in which limited access is sought, our cases have taken a more tailored approach to ascertaining the perimeters of a forum within the confines of the government property."  *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 800 (1985)(citations omitted); *accord Children of the Rosary*

*v. City of Phoenix Eyeglasses*, 154 U.S. 972, 976 (9th Cir. 1998). In this case, the area to which Plaintiffs seek access has all of the features of a public forum.

A.  <u>First Amendment</u>.  With its confluence of walkways, patios, benches, and park areas, and the continuous presence of students, faculty, staff, workers, and the public, the designated area is precisely the kind of place that has "immemorially been held in trust for the use of the public and time out of mind, ha[s] been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. CIO*, 307 U.S. 496, 515 (1939).

College campuses featuring areas substantially identical to the designated area have been recognized as public fora.  In *Students Against Apartheid Coalition v. O'Neil*, 660 F. Supp. 333 (W.D. Va. 1987) the court held "the central lawn" of the University of Virginia campus to be a public forum where activists had the right to erect wooden protest shanties. *Id.* at 338. The court noted the "similarity between an open campus lawn and a traditional public forum like municipal parks." *Id.*

The court in *Hays County Guardian v. Supple*, 969 F.2d 111 (5th Cir. 1992) observed that the grounds of Southwest Texas State University was the "site of a community of full-time residents . . . where people may enjoy the open air or the company of friends and neighbors in a relaxed environment." *Id*. at 117.  Such a place, the court held, is "akin to a public street or park." *Id*.

Relying on both state and federal law,[5] the court in *Burbridge v. Sampson*,

---

[5]  "While the [Cal. and U.S.] free speech provisions differ, California courts draw upon both state and federal law for their state constitutional analyses." *Burbridge v. Sampson*, 74 F. Supp. 2d 940, 947 (C.D. Cal. 1999); *See U.C. Nuclear Weapons Labs Conversion Project v. Lawrence Livermore Lab.,* 154 Cal. App.3d 1157, 1163 (1984); *Gonzales v. Superior Court of State of California for County of Ventura,* 180 Cal.App.3d 1116, 1123 (1986).

**MEM. OF LAW IN SUPP. OF MOT. FOR PREL. INJ.**

74 F. Supp. 2d 940 (C.D. Cal. 1999) had "no doubt that the . . . facilities and areas
on campus which the college has made generally available for use by students and
the community at large, including, *inter alia,* the area in front of the [Student
Services Center] – have been opened to the public." *Id.* at 947-48

The designated area is fully within these public forum parameters.  Located
adjacent to Bruin Walk East,[6] it is fully integrated into the campus and adjacent
community. The campus grounds are open to the general pubic, *see, e.g.*, *UCLA
Regulations on Activities, Registered Campus Organizations and Use of
Properties* § II. at 2 (6:00 a.m. to midnight)(hereinafter "*SRO Regs.*") and the
public is expressly invited to attend a variety of events at popular campus venues.[7]

Visitors may freely walk through campus to enjoy the scenery and
architecture, relax on one of the lawn areas, exercise, play with pets and children,
engage in sports, or read, without having to show identification or register.

Plaintiffs' expressive activities also contribute to UCLA's "quintessential
[mission as a] 'marketplace of ideas.'" Thomas J. Davis, *Assessing Constitutional
Challenges to University Free Speech Zones Under Public Forum Doctrine*, 79
Ind. L. J. 267, 275 (2004).  "Free and open association, discussion and debate are
important aspects of the educational environment of the University, and should be
actively protected and encouraged." *RSO Regs.* at 1.

"[T]he culture of free ideological exchange is deeply embedded in the

---

[6] Bruin Walk is the main free speech area on campus. "Known to everyone on
campus – and avoided by some – there is no denying that Bruinwalk has become
the UCLA campus highway."  Daily Bruin Staff, *This is my UCLA: Bruinwalk*,
Daily Bruin (June 6, 2010), found at https://dailybruin.com/2010/ 06/06/
gradbruinwalk2.

[7] Some of the more prominent venues include Ackerman Union/Kerkhoff Hall,
Royce Hall, the Hammer and Fowler Museums, Pauley Pavilion, the New Wright
Gallery, the Billy Wilder Theater, and the Schoenberg Music Hall. *See, e.g.,*
UCLA Happenings Events Calendar, *found at* https://happenings.ucla.edu.

**MEM. OF LAW IN SUPP. OF MOT. FOR PREL. INJ.**

1  collegiate setting. . . . [T]here is a broad diversity of speakers – students,

2  professors, non-teaching employees, vendors, external activists and the institution

3  itself – all of whom bring differing rights to their expression." Derek P.

4  Langhauser, *Drawing The Line Between Free And Regulated Speech On Public*

5  *College Campuses: Key Steps And The Forum Analysis*, 181 W.E.L.R. 339, 340

6  (Dec. 2003).

7      B.  <u>California Constitution</u>.  The designated area is also a public forum

8  under the Liberty of Speech Clause of the California Constitution because Krishna

9  Lunch is "compatible" with the intended and usual usage of the designated area. In

10  *Vegan Outreach, Inc. v. Riverside Cmty. College Dist.*, No. cv 09-4625, 2009 WL

11  10700113  (C.D. Cal. 2009) the Court relied on art. I., § 2 of the California

12  Constitution[8] in finding a central area on the Riverside Community College

13  ("RCC") campus to be a public forum:

14          These areas on the RCC campus are open to the public. Indeed, the
           Promenade area at the center of the RCC campus – an area where
15          leafleting is prohibited – appears to include a wide park-like expanse
           closed to vehicles. The Promenade area includes wide walkways and
16          benches for students and others to congregate. Moreover, Defendant
           allows commercial vendors to set up tents and booths in the
17          Promenade area.

18  *Id*. at *2.[9]

19

20  _____

21  [8]  "Every person may freely speak, write and publish his or her sentiments on
    all subjects, being responsible for the abuse of this right. A law may not restrain or
22  abridge liberty of speech or press." Cal. Const. art. I, § 2(a).  "The California
    Constitution, and California cases construing it, accords greater protection to the
23  expression of free speech than does the U.S. Constitution." *Gonzales v. Super. Ct.
24  of State of Cal. for County of Ventura,* 180 Cal. App. 3d 1116, 1122 (1986) (citing
    *Robins v. Pruneyard Shopping Center,* 23 Cal.3d 899, 903, 907–910 (1979)).
25

26  [9]  The Court relied on Ninth Circuit precedent, particularly *Kuba v. 1-A Agric.
    Ass'n*, 387 F.3d 850, 857 (9th Cir. 2004) ("protest activity is not inherently
27  incompatible" with use of Cow Palace walkways and parking lot area) and
    *Carreras  v. City of Anaheim*, 768 F.2d 1039, 1045 (9th Cir. 1985), *disagreed with*
28

*Prigmore v. City of Redding,* 211 Cal. App. 4th 1322 (2012)  found the outdoor grounds of a municipal library to be a public forum under both state and federal law. The court highlighted these features: (1) the area is surrounded by a public building; (2) there was unrestricted public access; (3) public forum classification was consistent with the Library's mission as "a mighty resource in the free marketplace of ideas"; (4) the area was adjacent to park-like areas; (5) the walkways were larger than standard walkways and included benches and other sitting areas; and (6) it was an area where people could rest or congregate for conversation. *Id*. at 1339.

All of these characteristics are present here. The designated area is centrally located in a prominent free speech area of campus.  It is bordered by major pedestrian thoroughfares,[10] and there is unrestricted public access to the area and surrounding buildings and grounds. Spacious lawn areas, patios, and benches are available to relax and gather for eating and discussion. (Brown Decl. ¶¶ 20-23).

Krishna Lunch will not interfere with pedestrian traffic or with the educational mission of the University.  No material health risk is posed because plaintiffs will follow all health and safety requirements, including those pertaining to COVID-19.  Krishna Lunch is thus fully compatible with the administrative and pedagogical interests of the University. *See, e.g., In re Hoffman*, 67 Cal. 2d 845, 850-51 (1967)*; U.C. Nuclear Weapons Labs. Conversion Project v. Lawrence Livermore Lab.,*154 Cal. App. 3d 1157, 1163 (1984).

_____

*on other grounds in Los Angeles Alliance for Survival v. City of Los Angeles,* 22 Cal. 4th 352 (2000) (solicitation not "incompatible with the intended uses of either the exterior areas of the stadium or the exterior walkways of the [Anaheim] convention center").

[10]  "[T]here is no denying that Bruinwalk has become the UCLA campus highway." Daily Bruin Staff, *This is my UCLA: Bruinwalk*, Daily Bruin (June 6, 2010), found at https://dailybruin.com/2010/ 06/06/gradbruinwalk2.

III.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

In deciding whether a preliminary injunction is appropriate, "The Ninth Circuit considers the likelihood of success on the merits 'the most important *Winter* factor; if a movant fails to meet this threshold inquiry, the court need not consider the other factors.'"  *Mitchell v. Newsom*, 509 F. Supp. 3d 1195,1200, (quoting *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017)).

A.  <u>Krishna Lunch Is Singled Out For Disfavored Treatment</u>.  UCLA singles out Krishna Lunch for disfavored treatment not applied to activities with similar impact, such as indoor and *other outdoor* food service, large outdoor events and activities, full capacity stores, museums, gyms, dining halls, performances, rallies, and concerts, to name a few. "[W]here a statute based on nonexpressive activity has the inevitable effect of singling out those engaged in expressive activity," *Mitchell*, 509 F. Supp. 3d at 1201 (*quoting Arcara v. Cloud Books, Inc*., 478 U.S. 697, 706-707 (1986)), it is subject to rigorous First Amendment scrutiny.

The Court in *Minneapolis Star and Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575 (1983) invalidated a tax applied to the sale of large quantities of newsprint.  The Court found that the tax "imposed a greater burden of justification on the State even though the tax was imposed upon a nonexpressive activity, since the burden of the tax inevitably fell disproportionately–in fact, almost exclusively–upon the shoulders of newspapers exercising the constitutionally protected freedom of the press." 478 U.S. at 704; *see Mitchell*, 509 F. Supp. 3d at 1202.

The same is true here. Not only does the ban fall disproportionately on Krishna Lunch – it falls *exclusively* on Krishna Lunch.  Many other activities are allowed freely all over campus, but Krishna Lunch is not, even though Krishna Lunch poses no threat to UCLA's interests.. *See UCLA return to campus, Visiting Campus*, *General visitors*, https://covid-19. ucla.edu/ucla-return-to-campus/. (*See also* Brown Decl. ¶¶ 17-23, Exs. B-H). Krishna Lunch is thus"treated uniquely

from all other types of businesses," and "bear[s] disproportionately the burden of the restriction." *Mitchell*, 509 F. Supp. 3d at 1202.

B. <u>The Ban Is Also Subject To Strict Scrutiny Because It Proscribes An Entire Category Of Expression.</u> There are "stringent standards . . . for restrictions on speech in traditional public fora." *Frisby v. Schultz,* 487 U.S. 474, 486 (1998). The "government may not prohibit all communicative activity" *Perry Educ. Assn. v. Perry Local Educ.s' Assn.,* 460 U.S. 37, 45 (1983) and it "must bear an extraordinarily heavy burden to regulate speech in such locales." *NAACP v. City of Richmond*, 743 F.2d 1346, 1355 (9th Cir. 1984).[11]

Content-neutral restrictions are especially capable of improperly restricting protected expressive activity. It is well-established, for example, that "[g]enerally directed means of communication" such as Krishna Lunch "may not be completely banned" in a public forum such as the designated area. *Frisby,* 487 U.S. at 486. The Supreme Court has

> voiced particular concern with laws that foreclose *an entire medium of expression*. . . . Although prohibitions foreclosing entire media may be completely free of content or viewpoint discrimination, the danger they pose to the freedom of speech is readily apparent – by eliminating a common means of speaking, such measures can suppress too much speech.

*City of Ladue v. Gilleo*, 512 U.S. 43, 54 (1994)(emphasis added)(citations and footnotes omitted).

"[A]n absolute prohibition on a particular type of expression will [thus] be upheld only if narrowly drawn to accomplish a compelling governmental interest."

---

[11] *See also, e.g.*, *United States v. Grace,* 461 U.S. 171, 177 (1984)("[T]he government's ability to permissibly restrict expressive conduct [in a public forum] is very limited"); *Perry,* 460 U.S. at  45 (1983) ("The protections afforded by the First Amendment are nowhere stronger than in streets and parks."); *Berger v. City of Seattle,* 569 F.3d 1029, 1035-36 (9th Cir. 2009)(en banc)("protections afforded by the First Amendment are nowhere stronger than in streets and parks, both categorized for First Amendment purposes as traditional public fora").

1   *Grace*, 461 U.S. at 177. The burden rests on UCLA "to demonstrate the

2   compelling interest requiring the restriction of free expression and to show that the

3   regulation serves that interest with the least restriction possible." *Women Strike for*

4   *Peace v. Hickel*, 420 F.2d 597, 605 (D.C. Cir. 1969)(Wright, J., concurring).[12]

5       C. The Ban Is Not The Least Restrictive Means Of Achieving A Compelling

6   State Interest. In support of its ban, UCLA cited its concern with "Covid and

7   safety issues." While significant in the abstract, this interest is not advanced by the

8   UCLA ban. The complete ban on Krishna Lunch nonetheless sweeps safe and

9   protected speech within its ambit. It is the antithesis of narrow tailoring in that

10   there are numerous and obviously less burdensome alternatives that are available

11   to address COVID-19 issues, or any other issues UCLA might raise.

12       For example, although not required to do so by current regulations,

13   plaintiffs will wear face masks at all times while on campus, even though Krishna

14   Lunch will be held outdoors in a "well-ventilated" area where there is an

15   abundance of space to maintain physical distancing. *See, e.g.*, Harvard Health

16   Pbl'g, *Preventing the spread of the corona virus*, (Oct. 13, 2021)("Harvard

17   Health"), found at https://www.health.harvard.edu/diseases-and-conditions/

18   preventing-the-spread-of-the-coronavirus. Similarly, although not required for an

19   outdoor program like Krishna Lunch, everyone associated with Krishna Lunch

20   will be *fully vaccinated*. And, physical distancing will be followed, and antiseptics

21   will be extensively used for cleansing. (Brown Decl. ¶¶ 12-15).

22       Every UCLA entity that follows one or more of these guidelines – masks,

23   vaccines, social distancing, and cleansing – is allowed to conduct their activities

24   on campus, *except* for Krishna Lunch, which raises the specter that the ban is

25   _____

26   [12] "To justify any intrusion [on First Amendment rights] at all, there must be a threshold showing that the factual situation demonstrates a real need for the

27   government to act to protect its interest." *Ass'n of Community Orgs. for Reform Now v. St. Louis County,* 930 F.2d 591, 594 (8th Cir. 1991).

28

**MEM. OF LAW IN SUPP. OF MOT. FOR PREL. INJ.**

1    actually "pretextual" *see Vegan Outreach*, 2009 WL at *3, and is not narrowly

2    tailored to serve a compelling governmental interest.

3        D. <u>The Restriction Fails The *O'Brien/*Time, Place And Manner Test</u>. The

4    Ninth Circuit requested this Court to determine "whether UCLA's restriction

5    passes constitutional muster under *United States v. O'Brien*." *See Krishna Lunch,*

6    79 Fed.Appx. at 314. Under *O'Brien,*

7           a government regulation is sufficiently justified if it is within the
     constitutional power of the Government; if it furthers an important or
8    substantial governmental interest; if the governmental interest is
     unrelated to the suppression of free expression; and if the incidental
9    restriction on alleged First Amendment freedoms is no greater than is
     essential to the furtherance of that interest.

10

11   391 U.S. at 377.

12       As argued above, the regulation now before the court is a total ban, not the

13   kind of regulation normally subject to the *O'Brien* test. But even under *O'Brien,*

14   UCLA would  the burden of demonstrating that the ban "advance[s] important

15   government interests unrelated to the suppression of free speech, and do[es] so in

16   ways that effect as minimal a restriction on [Krishna Lunch] as possible." *Jacobs*

17   *v. Clark County Sch. Dist.*, 526 F.3d 419, 435 (9th Cir. 2008).[13] If the restriction

18   "fails to satisfy any one of these [requirements], it is unconstitutional." *Edwards v.*

19   *City of Coeur D'Alene,* 262 F.3d 856, 862 (9th Cir. 2001); *Grossman v. City of*

20   *Portland,* 33 F.3d 1200, 1205 (9th Cir. 1995).

21       1. <u>The ban is content-based</u>. Even where an enactment "contains no

22

23   [13] *O'Brien* has been held to include a requirement that the government provide
     an alternative channel of communication. "The third prong of the intermediate
24   scrutiny test has been stated in several forms but . . . focuses on whether the
     regulation 'leave[s] open ample alternative channels' [of] communication."
25   *Jacobs,* 526 F.3d at 437 (quoting *Colacurcio v. City of Kent,* 163 F.3d 545, 551
     (9th Cir.1998))."[I]n the last analysis [there] is little, if any, differen[ce] from the
26   standard applied to time, place, or manner restrictions" and *O'Brien. See Clark v.*
27   *Community for Creative Non-Violence*, 468 U.S. 288, 298 (1984).
28

1    explicit content-based limitation on the scope of prohibited conduct," *United*

2    *States v. Eichman,* 496 U.S. 310, 315 (1990), a court must consider whether the

3    law "suppresses expression out of concern for its likely communicative impact. *Id.*

4    at 317. UCLA should not be allowed to simply "recite" a generalized, amorphic

5    interest in fighting COVID-19, but should rather be required to explain precisely

6    how Krishna Lunch is more dangerous that the numerous analogous campus

7    commercial and quasi-commercial activities that are operating at full capacity.

8    *Jacobs*, 526 F.3d at 432 (the "mere assertion of a benign purpose is insufficient to

9    *conclusively establish* a regulation's content-neutrality") (emphasis in original);

10   *see also Turner Broad. Sys., Inc. v. Fed. Commc'n Comm'n*, 512 U.S. 622, 642-43

11   (1994) ("the mere assertion of a content-neutral purpose [is not] enough to save a

12   law which, on its face, discriminates based on content.").

13       As of September 23, 2021, UCLA allows a wide range of activities which

14   are indistinguishable in form and impact from Krishna Lunch. For example,

15   "[restaurants and dining halls on campus can now operate indoors *and outdoors*

16   *with no limits on seating capacity or physical distancing requirements*." *UCLA*

17   *return to campus, Visiting Campus*, *General visitors*, https://covid-19.ucla.edu/

18   ucla-return-to-campus/.

19       In *Vegan Outreach,* the plaintiffs asserted that a Riverside Community

20   College ban on campus literature distribution, but not a ban on analogous

21   commercial activities, was content-based. The court stated: "[T]he fact that the

22   commercial speech activities allowed in the Promenade area appear to pose the

23   type of traffic congestion issues Defendant claims it seeks to prevent by

24   prohibiting leafleting activities in the same area suggests that Defendant's ban on

25   such activities is pretextual." 2009 WL 10700113, at *3.

26       UCLA has not proffered *any* evidence linking Krishna Lunch to the

27   coronavirus. Nor has it shown that Krishna Lunch's use of masks, vaccines,

28

**MEM. OF LAW IN SUPP. OF MOT. FOR PREL. INJ.**

1  physical distancing, and cleansing are not sufficient safeguards.[14]against the virus.

2  *Cf. Kuba v. 1-A Agric. Ass'n*, 387 F.3d 850, 860 (9th Cir. 2004) ("There is no

3  record of harm or safety concerns caused by such activity in the supposedly

4  congested areas. This void in the record belies the Association's claim that a

5  demonstrator handing out leaflets would contribute to the harm alleged."); *See*

6  *also Vegan Outreach*, 2009 WL 10700113, at *3.

7         Belying UCLA's contrived ban on Krishna Lunch, bona fide public health

8  authorities are virtually unanimous in their opinion that vaccinations, face masks,

9  physical distancing, and frequent antibacterial cleansing are more than sufficient

10  to prevent the spread of the virus. *See, e.g.*, World Health Organization,

11  *Coronavirus disease (COVID-19): Small public gatherings* (Aug. 6, 2020)

12  https://www.who.int/emergencies/diseases/novel-coronavirus-2019/question-and-

13  answers-hub/ q-a-detail/coronavirus-disease-covid-19-small-public-gatherings;

14  Centers for Disease Control and Prevention, *COVID-19: How to Protect Yourself*

15  *and Others* (Updated Aug. 13, 2021).

16  https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html.

17         Wear masks as advised by the CDC. Physically distance. Socialize
        outdoors. Avoid crowded indoor spaces. Wash your hands frequently.
18         If you are not fully vaccinated, these are essential precautions you
        should take to reduce your risk of catching or spreading coronavirus.
19

20  Harvard Health Publ'g, *Preventing the spread of the coronavirus*, (Oct. 13, 2021)

21  https://www.health.harvard.edu/diseases-and-conditions/preventing-the-spread-of-

22  the-coronavirus.

23

24         [14] It is no coincidence that while meat consumption is a far greater hazard to
    health and the environment *see, e.g.* Jano le Roux, *"Meat is now classified as the*
25  *same level of cancer-causing products as tobacco,"* *the WHO says,* (June 15,
    2021), https://original.newsbreak.com/@jano-le-roux-561725/ 2281886417094-
26  meat-is-now-classified-as-the-same-level-of-cancer-causing-products-as-tobacco-t
    he-who-says?s=i3, than is a vegan orvegetarian diet, UCLA treats Krishna Lunch
27  as if it were the so-called hazard.
28

**MEM. OF LAW IN SUPP. OF MOT. FOR PREL. INJ.**

1    *Clark v. Community for Creative Non-Violence*, 468 U.S. 288 (1984)

2    observed that "[t]here is no gainsaying that preventing overnight sleeping will

3    avoid a measure of actual or threatened damage to Lafayette Park and the Mall."

4    468 U.S. at 299. But the ban imposed by UCLA on Krishna Lunch will not in any

5    capacity "avoid a measure of actual or threatened damage" from the coronavirus.

6    UCLA is unable to identify even a shred of evidence that if plaintiffs are

7    vaccinated, wear masks, physical distance, and frequently use antibacterial

8    cleansers, that Krishna Lunch will have an adverse impact on the spread of Covid.

9            It is not sufficient, consequently, that Defendant be permitted to assert a

10   generalized concern with COVID-19 beyond what every other institution and

11   individual in this country is dealing with. UCLA has utterly failed to "demonstrate

12   that the recited harms are real, not merely conjectural and that the regulation will

13   in fact alleviate these harms in a direct and material way" *Turner,* 512 U.S. at 664.

14           UCLA's asserted interest here is therefore pretextual. Defendant vigorously

15   opposed Krishna Lunch long before the pandemic, and has merely latched onto

16   COVID-19 as yet another pretext for banning plaintiffs' religious exercise. There

17   is no reasoned basis for distinguishing Krishna Lunch from the other restaurants

18   and large outdoor activities that are allowed on campus.

19           2. The restriction is not narrowly tailored. "[A]lthough the chosen

20   restriction 'need not be the least restrictive or least intrusive means' available to

21   achieve the government's legitimate interests . . . the existence of obvious, less

22   burdensome alternatives is 'a relevant consideration in determining whether the

23   'fit' between ends and means is reasonable,'" *Berger v. City of Seattle,* 569 F.3d

24   1029, 1041 (9th Cir. 2009)(en banc)(quoting *City of Cincinnati v. Discovery*

25   *Network,* 507 U.S. 410, 417 n.13 (1993)(citations omitted)); *see also Santa*

26   *Monica Food Not Bombs,* 450 F.3d 1022, 1041 (2006) ("We observe as well that

27   there are obvious alternative ways the City could adjust the Events Ordinance so

28   that it is appropriately tailored to its asserted interests.").

---

**MEM. OF LAW IN SUPP. OF MOT. FOR PREL. INJ.**

1  Defendant has the burden of proving the ban is "narrowly tailored to serve a

2  significant governmental interest." *Ward v. Rock Against Racism*, 491 U.S. 781,

3  799 (1989). The burden has two components: (1) the regulation must directly and

4  substantially further an important governmental interest; and (2) any incidental

5  restriction on alleged First Amendment freedoms must be no greater than is

6  essential to the furtherance of that interest. *Members of City Council v. Taxpayers*

7  *for Vincent*. 466 U. S. 789, 805 (1984) (*quoting O'Brien*, 391 U.S. at 377).

8  UCLA's unwillingness to implement the safeguards recommended not only

9  by UCLA, but by the World Health Organization and Center for Disease Control

10  as well, is powerful evidence that UCLA is not sincerely seeking to solve the

11  problems that it has identified, and that the complete ban on Krishna Lunch is not

12  narrowly tailored to achieve its legitimate ends.

13  In *Discovery Network,* the Court observed that [a] regulation need not be

14  'absolutely the least severe that will achieve the desired end,' . . . but if there are

15  numerous and less burdensome alternatives to the restriction on . . . speech, that is

16  certainly a relevant consideration in determining whether the 'fit' between the

17  ends and means is reasonable." *Id*. at 417 n.13 (citing *Bd. of Trustees of Univ. of*

18  *N.Y. v. Fox,* 492 U.S. 469, 480 (1989).

19  Similarly, in *Project 80's, Inc. v. City of Pocatello*, 942 F.2d 635, 638 (9th

20  Cir. 1991) the Ninth Circuit emphasized that "[b]y pointing out the alternatives

21  available to the cities to advance their interests, we do not impose a least

22  restrictive means requirement. Rather, we conclude, as did the Supreme Court in

23  *Fox*, that restrictions which disregard far less restrictive and more precise means

24  are not narrowly tailored." *See also Multimedia Publ'g Co. v. Greenville-*

25  *Spartanburg Airport Dist.*, 991 F.2d 154, 161 (4th Cir. 1993)("While the [Airport]

26  Commission need not choose the most reasonable regulation available to it, its

27  failure to select this simple, available alternative suggests something about both

28  the veracity of its asserted justification and the reasonableness of its blanket ban.).

**MEM. OF LAW IN SUPP. OF MOT. FOR PREL. INJ.**

Furthermore, in the context of the entire campus and all of the analogous activities that UCLA allows, the ban on Krishna Lunch, which occupies a total of about 100 square feet, "only marginally advance[s its] asserted interests" *Berger,* 569 F.3d at 1041, if at all. And, as emphasized in detail above, there are a plethora of *ready available* less restrictive alternatives to a complete ban. Plaintiffs agreement to wear masks, be vaccinated, and to practice and enforce social distancing should be the end of the issue.[15]

These specific measures are, according to the Defendant, sufficient for every other campus entity – except Plaintiffs. It cannot in good faith be established that these measures are efficacious as applied to Defendant's commercial operations, but not to Krishna Lunch. The Court's observations in *Vegan Outreach* are thus equally applicable here regarding COVID-19:

> Also bringing into question the significance of the state interest in limiting protestors is the evidence showing that radio stations have given out buttons or promotional material on the walkway and that individuals often sell programs and concessions outside the ticket office. There is no record of harm or safety concerns caused by such activity in the supposedly congested areas. This void in the record belies the Association's claim that a demonstrator handing out leaflets would contribute to the harm alleged.

*Vegan Outreach*, 2009 WL 10700113 at *3.

The Defendant cannot maintain, on the one hand, that these measures are efficacious as applied to UCLA's commercial entities (including eating facilities that sell primarily meat products) but are inadequate for Krishna Lunch.

## IV.   IRREPARABLE HARM

Where the "deprivation of a constitutional right is involved, . . . no further

_____

[15] Plaintiffs also intend to comply with other COVID-19 measures, including proof of vaccination (or proof of a negative COVID-19 test). *See UCLA return to campus, invited guests and third-party contractors*, https://covid-19.ucla.edu/ucla-return-to-campus/

showing of irreparable injury is necessary.'" *Gutierrez v. Mun. Ct.*, 838 F.2d 1031, 1045 (9th Cir. 1988)(quoting *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984). This is especially so in free speech cases. *E.g., Springfield v. San Diego Unified Port Dist*., 95 F. Supp. 1482, 1490 (S.D. Cal. 1996). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1058 (9th Cir. 1995).

The distribution of sanctified vegan and vegetarian food is essential to Plaintiffs' ability to disseminate their pro-animal/anti-meat message to their "intended audience." (Brown Decl. ¶¶ 7, 24); *see Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1228-229 (9th Cir. 1990). The opportunity to exercise these rights is critical because "the ephemeral opportunity to present one's [views] to an interested audience is lost and the next day's opportunity is different." *Jacobsen v. U.S. Postal Serv.*, 812 F.2d 1151, 1154 (9th Cir. 1987).

V.    AN INJUNCTION SERVES THE PUBLIC INTEREST.

UCLA has not shown that Krishna Lunch is a health hazard, or that it will spread COVID-19, anymore than the myriad of activities that UCLA allows.[16] Nor has UCLA shown that public health would be imperiled if plaintiffs conducted Krishna Lunch at the designated area and followed the less restrictive measures discussed extensively herein.

Where the plaintiffs establish the likelihood of success on the merits, the public interest will also be implicated in injunction actions involving First Amendment challenges. *Gannett Co., Inc. v. DePasquale,* 443 U.S. 368, 383 (1979)(it is always in the public interest to prevent one from violating another's

---

[16] Plaintiffs' willingness to be vaccinated, wear masks, physically distance, and liberally use antiseptic cleansers is unprecedented, and exceeds the COVID-19 regulations applicable everywhere else on campus.

1  constitutional rights).[17] "[T]o the extent that issuing injunctive relief will vindicate

2  important civil rights . . . injunctive relief is in the public interest." *Vegan*

3  *Outreach*, 2009 U.S. Dist. WL 10700113 at *4.

4  VI.    RECENT SUPREME COURT DECISIONS WARRANT THE

5          REINSTATEMENT OF PLAINTIFFS' FREE EXERCISE CLAIM.

6          This Court's holding that Krishna Lunch is not protected by the Free

7  Exercise Clause was upheld by the Ninth Circuit. Since that time, however, the

8  Supreme Court has provided important clarification regarding the level of scrutiny

9  to be applied to rights encompassed by the Free Exercise Clause in a COVID-19

10  context. Plaintiffs submit that these decisions directly impact the rights at issue

11  here, and that their Free Exercise claim should be reinstated.

12          In *Roman Catholic Diocese,* the Supreme Court issued a preliminary

13  injunction blocking severe restrictions from being placed on two New York City

14  religious organizations by the Governor. The Court found, in particular, that the

15  restrictions on the number of people permitted to participate in religious

16  gatherings and observances was harsh, discriminatory, and excessive. The

17  restrictions applied regardless of the size of the facility or the congregation. The

18  Court found it "hard to believe that admitting more than 10 people to a 1,000–seat

19  church or 400–seat synagogue would create a more serious health risk than the

20  many other activities that the State allows." 141 Sup. Ct. at 67.

21           *Roman Catholic* thus focused on the discriminatory manner in which places

22  of worship were treated as opposed to their commercial counterparts. The

23  regulations could "not be viewed as neutral because they single out houses of

24  worship for especially harsh treatment." *Id*. at 66.

25

_____

26      [17] *See e.g. Pacific Gas & Elec. v. P.U.C. of California,* 475 U.S. 1, 8
(1986)("By protecting those who wish to enter the marketplace of ideas from
27  government attack, the First Amendment protects the public's interest in receiving
information.").
28

1
2
3
4
5

> The Governor considers essential [businesses to] include hardware stores, acupuncturists, and liquor stores. Bicycle repair shops, certain signage companies, accountants, lawyers, and insurance agents are all essential too. So, at least according to the Governor, it may be unsafe to go to church, but it is always fine to pickup another bottle of wine, shop for a new bike, or spend the afternoon exploring your distal points and meridians. Who knew public health would so perfectly align with secular convenience?

6

*Id*. at 69 (Gorsuch, J., concurring).

7
8
9
10
11
12
13

Because of this glaring disparity, the Court held that "the regulations cannot be viewed as neutral because they single out houses of worship for especially harsh treatment." *Id*. at 66. "These restrictions apply even to the largest cathedrals and synagogues, which ordinarily hold hundreds. And the restrictions apply no matter the precautions taken, including social distancing, wearing masks, leaving doors and windows open, forgoing singing, and disinfecting spaces between spaces between services." *Id*. at 69.

14
15
16
17

The Court further explained that, like here, "[n]ot only is there no evidence that the [two houses of worship] have contributed to the spread of COVID-19[,] but there were many other less restrictive rules that could be adopted to minimize the risk to those attending religious services. *Id.* at 66.

18
19
20
21
22

Justice Kavanaugh also took issue with the "strict and inflexible numerical caps [that] apply even to large churches and synagogues that ordinarily can hold hundreds of people and that, *with social distancing and mask requirements*, could still easily hold far more . . . people." *Id.* at 73 (Kavanaugh, J., concurring) (emphasis added).

23
24
25

> I do not doubt the State's authority to impose tailored restrictions – even very strict restrictions – on attendance at religious services and secular gatherings alike. But the New York restrictions on houses of worship are not tailored to the circumstances given the First Amendment interests at stake.

26

*Id*. at 3 (Kavanaugh, J., concurring).

27
28

Justice Gorsuch underscored the availability of less restrictive alternatives. "Not only is there no evidence that the applicants have contributed to the spread of

**MEM. OF LAW IN SUPP. OF MOT. FOR PREL. INJ.**

COVID–19 but there are many other less restrictive rules that could be adopted to minimize the risk to those attending religious services. Among other things, the maximum attendance at a religious service could be tied to the size of the church or synagogue." *Id.* at 67. The Court concluded "that enforcement of the Governor's severe restrictions on the applicants' religious services must be enjoined." *Id*. at 69.[18]

The significance of *Roman Catholic* cannot be underestimated. In *Calvary Chapel Dayton Valley v. Sisolak*, 982 F.3d 1228 (9th Cir. 2020) this Circuit reviewed an emergency COVID directive that (like the restriction here) "expressly treat[ed] at least six categories of secular assemblies better than it treat[ed] religious services. . . includ[ing] casinos, restaurants and bars, amusement and theme parks, gyms and fitness centers, movie theaters, and mass protests." *Id*. at 1231.[19] After emphasizing that "[t]he Supreme Court's recent decision in [Catholic Diocese] arguably represents a seismic shift in Free Exercise law," *id*. at 1228, the Court explained:

> [T]he Directive treats numerous secular activities and entities significantly better than religious worship services. Casinos, bowling alleys, retail businesses, restaurants, arcades, and other similar secular entities are limited to 50% of fire-code capacity, yet houses of worship are limited to fifty people regardless of their fire-code capacities. As a result, the restrictions in the Directive, although not identical to New York's, require attendance limitations that create the same 'disparate treatment' of religion. . . . Because 'disparate treatment' of religion triggers strict scrutiny review – as it did in *Roman Catholic Diocese*—we will review the restrictions in the Directive under strict scrutiny.

*Id*. at 982 F.3d at 1232 (citations omitted).

On this basis, the Court held that the attendance restriction was not narrowly

---

[18] Other "essential" businesses included "laundry and liquor, travel and tools." *Id.*

[19] Section 11 of the Directive imposed a 50-person cap on "indoor in-person services" at "houses of worship." *Id.*

**MEM. OF LAW IN SUPP. OF MOT. FOR PREL. INJ.**

tailored because (like here) there were less restrictive ways of dealing with COVID in a religious worship setting. *Id*. at 1234. The Court also expressly instructed the district court to apply strict scrutiny to the Directive, and preliminarily enjoined its Directive's enforcement" pending a final judgment." *Id*.

So too should UCLA's ban on Krishna Lunch be enjoined as a violation of the Free Exercise Clause. UCLA has implemented various COVID-19 requirements to be followed, to varying degrees, by all sectors of the UCLA community. UCLA has returned to pre-pandemic levels of operation. Yet, plaintiffs' constitutional rights have been eviscerated.

Plaintiffs have agreed to be vaccinated, to wear masks, to maintain physical distancing, and to use antiseptic cleansers. Rather than allow plaintiffs to conduct Krishna Lunch on campus if they adhere to these conditions, however, UCLA has instead singled out Krishna Lunch for especially harsh or disfavored treatment that is not imposed on plaintiffs' commercial counterparts.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs' motion for a preliminary injunction should be granted.

Dated: November 12, 2021          Respectfully submitted,

LAW OFFICES OF ROBERT C. MOEST

-and-

LAW OFFICES OF DAVID M. LIBERMAN


By:____S/Robert C. Moest_____
           Robert C. Moest
        Attorneys for Plaintiffs

**MEM. OF LAW IN SUPP. OF MOT. FOR PREL. INJ.**